IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| TIME WARNER TELECOM OF OREGON, | ) | |
| LLC, and QWEST COMMUNICATIONS | ) | |
| CORP., | ) | CV 04-1393-PA |
| Plaintiffs, | ) | |
| | ) | **OPINION** |
| v. | ) | |
| | ) | |
| THE CITY OF PORTLAND, | ) | |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| QWEST CORP., | ) | |
| | ) | CV 05-1386-PA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF PORTLAND, | ) | |
| | ) | |
| Defendant. | ) | **CONSOLIDATED CASES** |

**PANNER, J.**

In these consolidated actions, one issue remains for decision:  the City of Portland's counterclaim for breach of contract against Time-Warner Telecom of Oregon, LLC (TWT).  The

1 - OPINION

parties have submitted the issue to the court for resolution.

These are my findings of fact and conclusions of law.  I conclude that TWT breached its franchise agreement with the City by failing to treat revenues from information and co-location services as "gross revenues."

### FINDINGS OF FACT

In 1997, the City granted GST Telecom Oregon, Inc. (GST), a ten-year franchise to operate a fiber optics telecommunications system in Portland.  In 2000, GST went into bankruptcy proceedings, and TWT purchased some of GST's assets.  In 2002, the City consented to the transfer of GST's franchise agreement to TWT.

The franchise agreement requires that TWT pay the City a fee equal to 5% of TWT's gross revenues.  The franchise agreement defines "gross revenues" as

> gross revenues derived by the Grantee for the provision of Telecommunications Services (I) originating or terminating in Portland, Oregon and (ii) charged to a circuit location in Portland, Oregon regardless of where the circuit is billed or paid.

Soloos Decl., Ex. 3, at § 2.9.  The franchise agreement defines "telecommunications services" as

> (A) Services interconnecting interexchange carriers, competitive carriers, and/or wholesale telecommunications providers for the purpose of voice, video, or data transmission;

> (B) Services connecting interexchange carriers and/or competitive carriers to telephone companies providing local exchange services for the purpose of voice,

2 - OPINION

video, or data transmission;

(C) Services connecting interexchange carriers or competitive carriers to any entity, other than another interexchange carrier, competitive carrier, or telephone company providing local exchange services, for the purpose of voice, video, or data transmission;

(D) Services interconnecting any entities, other than interexchange carriers, competitive carriers, or telephone companies providing local exchange services, for the purpose of voice, video, or data transmission; and
. . . .

(F) Other telecommunications services as authorized by the Federal Communications Commission or the Oregon Public Utility Commission.

Soloos Decl., Ex. 3, at § 2.15.

The City first used this definition of "telecommunications services" in a 1990 franchise agreement with Electric Lightwave, Inc. <u>See</u> Soloos Decl. at 3. The City has continued to use this definition, with minor changes, in subsequent franchise agreements with competitive local exchange carriers such as TWT. <u>Id.</u> at 4. The City has 10 such franchise agreements.

TWT sells "information services" to Portland customers. TWT's information services are

wireline broadband Internet access services. They combine, in an integrated package, data transport with computer processing, information provision, and computer interactivity, enabling users to run a variety of applications. The data transport component of the package allows a TWT customer to send data to and receive data from various points on the Internet.

Stipulation ¶ 6. TWT provides information services through interconnected regional networks, and offers dedicated

3 - OPINION

connections from a customer's premises to local Internet "Points
of Presence."  The information services include Dedicated
Internet Access Service, Ethernet Internet Service, and Shared
Web Hosting.[1]

TWT sells "co-location" (also referred to as "collocation")
services to customers in Portland.  Co-location service provides
a customer with a dedicated physical space for telecommunications
and computing equipment.  TWT provides this service "only to
customers who also purchase Internet access connectivity or
switched and transport services."  Stipulation ¶ 24.

When TWT began operations in Portland, it paid the City
franchise fees on gross revenues from its information and co-
location services.  TWT stopped paying fees on information
services in 2002, and stopped paying fees on co-location services
in 2003.

## CONCLUSIONS OF LAW

The issue is whether TWT's information and co-location
services are "telecommunication services" under the franchise
agreement.

The franchise agreement "is a mutually binding contract,
subject to the state law governing contracts."  City of Portland
v. Electric Lightwave, Inc., Civ. No. 03-538-AS, 2005 U.S. Dist.

---

[1]The City has dropped its claim that TWT's Managed Security
Services should be treated as "telecommunications services."

4 - OPINION

Lexis 26734, slip op. at 31 (D. Or. May 5, 2005) (<u>ELI</u>).  "The
construction of a contract is a question of law."  <u>In re Marriage
of Taylor</u>, 193 Or. App. 694, 696, 92 P.3d 124, 124 (2004)
(footnote and citations omitted).

When interpreting a contract, the court first examines the
contract as a whole to determine whether the disputed provision
is ambiguous.  <u>See</u> <u>Yogman v. Parrott</u>, 325 Or. 358, 361, 937 P.2d
1019, 1021 (1997).  "Unambiguous contracts must be enforced
according to their terms."  <u>Pacific First Bank v. New Morgan Park
Corp.</u>, 319 Or. 342, 347, 876 P.2d 761, 764 (1994); <u>see</u> Or. Rev.
Stat. § 42.230 (in construing a written contract, the court must
"ascertain and declare what is, in terms or in substance,
contained therein, [and must not] insert what has been omitted,
or . . . omit what has been inserted").

"A contractual provision is ambiguous if it is susceptible
to more than one reasonable interpretation."  <u>Nixon v. Cascade
Health Services, Inc.</u>, 205 Or. App. 232, 238, 134 P.3d 1027, 1030
(2006) (citation omitted).  In determining whether a provision is
ambiguous, the court must consider "the text and context of the
provision."  <u>Id.</u> (citation omitted); <u>see</u> Or. Rev. Stat. § 42.220.

> The terms of a writing are presumed to have been
> used in the primary and general acceptation, but
> evidence is admissible that they have a technical,
> local, or otherwise peculiar signification and were
> used and understood in the particular instance, in
> which case the agreement shall be construed
> accordingly.

5 - OPINION

Or. Rev. Stat. § 42.250.

If the provision is ambiguous, the court examines extrinsic evidence to determine the intent of the parties.  <u>Yogman</u>, 325 Or. at 363-64, 937 P.2d at 1022.  If extrinsic evidence does not resolve the ambiguity, the court applies maxims of contractual interpretation.  <u>Id.</u> at 364, 937 P.2d at 1022.

**I.   TWT's Information Services Are Telecommunications Services**

The parties dispute whether the franchise's definition of "telecommunications services" covers TWT's information services.

Under the franchise agreement, "telecommunications services" include

Services connecting interexchange carriers or competitive carriers to any entity, other than another interexchange carrier, competitive carrier, or telephone company providing local exchange services, for the purpose of voice, video, or data transmission; and

Services interconnecting any entities, other than interexchange carriers, competitive carriers, or telephone companies providing local exchange services, for the purpose of voice, video, or data transmission.

Soloos Decl., Ex. 3, at § 2.15(C) & (D).

Omitting the "other than" clauses from § 2.15(C) & (D), "telecommunications services" are:

Services connecting interexchange carriers or competitive carriers to any entity . . . for the purpose of voice, video, or data transmission; and

Services interconnecting any entities . . . for the purpose of voice, video, or data transmission.

I conclude that on their face, the definitions of

telecommunications services in § 2.15(C) and (D) cover TWT's information services. TWT's information services connect, or interconnect, TWT's customers ("any entities") to the Internet through TWT or other "competitive carriers" "for the purpose of . . . data transmission." The definitions are not ambiguous, so there is no need to resort to extrinsic evidence to determine the parties' intent.

TWT notes that the franchise agreement uses the words "connect" and "interconnect" in its definitions of telecommunications services. TWT contends that the parties intended to use the word "interconnect" as a term of art, referring only to "interconnection services, i.e., the facilities and equipment used to accomplish the physical linking of two telecommunications networks for the mutual exchange of traffic. 'Interconnection' does not include the transport and termination of traffic." TWT Reply at 1. TWT asserts that its information services do not physically link telecommunications networks, and are not provided to telecommunications carriers. TWT argues that its customers do not "interconnect," at least not as TWT defines "interconnect."

TWT presents no evidence on the parties' intent when they entered into the franchise agreement. To prevail on its argument that the parties intended that "interconnect" have a specialized meaning, TWT must overcome the statutory presumption that "[t]he

terms of a writing . . . have been used in the primary and
general acceptation." Or. Rev. Stat. § 42.250. The agreement
does not define "connect" or "interconnect." In general usage,
"interconnect" is a synonym of "connect." The franchise
agreement appears to use the two words interchangeably. As the
City notes, the franchise agreement does not use the noun
"interconnection," the word cited by TWT as a term of art, but
rather uses the verbs "interconnecting" and "connecting."

    TWT has not shown that the telecommunications industry
necessarily uses the word "interconnect" in such a limited way.
In 47 U.S.C. § 251, Congress did use the word "interconnection"
in the sense cited by TWT. However, the City's expert, Dr. Alan
Pearce, states that in his experience, the telecommunications
industry uses the word "interconnect" in the broader sense:
"When I speak to my colleagues in the telecommunications
industry, if I tell them that two points or two users are
'interconnected' they do not assume at all that those two points
or users must of necessity be only two common carrier networks."
Pearce Decl. ¶ 15.

    TWT argues that, in light of the definitions' references to
interexchange carriers, competitive carriers, and telephone
companies, the phrases "any other entity" and "any entities" must
refer only to telecommunications providers, and therefore could
not refer to TWT's customers for information services. The

franchise agreement defines "telecommunications services," in
part, as "services connecting interexchange carriers and/or
competitive carriers to any other entity" and as "services
interconnecting any entities, other than interexchange carriers,
competitive carriers, or telephone companies providing local
exchange services."  Soloos Decl., Ex. 3, at § 2.15(C) & (D)
(emphasis added).

     TWT has not shown that its narrow reading of the word
"entity" is justified.  Section 2.15(D) refers to several types
of carriers in order to exclude such carriers from the otherwise
all-encompassing phrase "any entities."  The agreement does not
limit the phrase "any entities" to carriers.

     Nor does the clause in § 2.15(C), "services connecting
interexchange carriers and/or competitive carriers to any other
entity," show that the phrase "any other entity" refers only to
carriers.  If the parties had intended that the phrase "any other
entity" would refer only to carriers, they would have written
"any other carrier," rather than using the generic word "entity."

     I conclude that the parties did not intend to use the word
"interconnect" as a term of art meaning a connection only between
two telecommunications providers.

     The City argues that even if the franchise agreement's
definitions of "telecommunications services" are ambiguous,
Oregon's rules of contract interpretation require that doubtful

terms in a municipal franchise agreement "'are to be construed strictly against the grantee and liberally in favor of the public.'"  Northwest Natural Gas Co. v. City of Portland, 300 Or. 291, 308, 711 P.2d 119, 130 (1985) (quoting City of Joseph v. Joseph Water Works Co., 57 Or. 586, 591, 111 P. 864, 865, 112 P. 1083 (1911)).  Because I conclude that the franchise agreement is not ambiguous, I need not address this issue.

## II.  Co-Location Services Are Telecommunications Services

The parties dispute whether revenues from co-location services should be treated as "gross revenues" under the franchise agreement.  In the ELI decision, Magistrate Judge Ashmanskas concluded co-location service is a telecommunications service under that franchise agreement.  Judge Ashmanskas reasoned that the purpose of the co-location service "is to connect the customer to ELI's network.  Indeed, ELI does not rent space to a customer unless they also purchase connectivity." ELI, slip op. at 66.

Judge Ashmanskas was interpreting a provision of the ELI franchise agreement that is effectively the same as the provision at issue here.  See Soloos Decl., Ex. 2, at 1-2 (definition of "telecommunications services" in the ELI franchise agreement). ELI's co-location services are also similar to those provided by TWT.  I agree with Judge Ashmanskas's ruling, and conclude that TWT must include revenues from co-location services as "gross

revenues" under the franchise agreement.

TWT contends that Judge Ashmanskas erred in stating that the industry treats co-location as a telecommunications service. Assuming TWT is correct about industry usage, that does not undercut Judge Ashmanskas's reasoning, which was based mainly on the nature of the co-location services.

### CONCLUSION

The City's motion for judgment on its second counterclaim (#116) is granted.  By July 24, 2006, the parties are to submit a stipulation on the amount of damages, based on their previous stipulation.  If the parties cannot stipulate to the amount of damages, the court will then resolve the issue.

The City's motion to exclude the declaration of Don J. Wood (#123) is denied as moot.

DATED this 7th day of July, 2006.


_____/s/_____

OWEN M. PANNER
U.S. DISTRICT COURT JUDGE

11 - OPINION